**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| **MATHEW NADOLSKI, as Personal** | ) | |
| **Representative of the Estate of** | ) | |
| **MELISSA PUZA,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Cause No.: 2:07-CV-164** |
| | ) | |
| **MICHAEL HUNNICUT and the** | ) | |
| **PORTER COUNTY SHERIFF'S** | ) | |
| **DEPARTMENT,** | ) | |
| | ) | |
| **Defendants.**[1] | ) | |

## OPINION AND ORDER

This matter is before the court for resolution of several pending motions. The

defendants, Michael Hunnicut ("Hunnicut") and the Porter County Sheriff's Department

("Sheriff's Department") filed a motion for summary judgment on February 18, 2009. Docket at

56. The plaintiff, Mathew Nadolski ("Nadolski"), filed a response in opposition to the motion on

March 18, 2009. Docket at 65. The defendants filed a reply brief on April 6, 2009. Docket at

70. Also, on April 3, 2009, the defendants filed a motion to strike the testimony of one of the

---

[1] For purposes of clarification, the court notes that Plaintiff Mathew Nadolski's first name is spelled alternately as "Mathew" or "Matthew" in various filings. Defendant Michael Hunnicutt's name is spelled alternately as "Hunnicut" or "Hunnicutt." *See, e.g.*, Agreed Motion to Amend Caption, docket at 26. The original Complaint spells Nadolski's first name with only one "t" and also spells Hunnicut's name with only one "t." Docket at 1. The defendants use the spelling "Hunnicut" in their Answer to the Complaint, but use the spelling "Hunnicutt" in their brief in support of their motion for summary judgment. This confusion is not relevant to any issue, of course, and the court will adopt the spellings as they appear in the original Complaint. Also, throughout this Opinion and Order, the page numbers of the parties' various pleadings to which the court cites are the page numbers assigned to those documents by the court's electronic docketing system (which appear at the top of every page of each document filed), and may or may not coincide with the page numbers placed on those same documents by the parties.

plaintiff's witnesses. Docket at 67. The plaintiff filed a response to that motion on April 9, 2009 (docket at 74) and the defendants filed a reply on April 21, 2009 (docket at 75). In addition, the plaintiff filed a motion to strike the defendants' reply brief in support of their motion for summary judgment on April 6, 2009 (docket at 71), to which the defendants responded on April 7, 2009 (docket at 73). As of the date of this Opinion and Order, the plaintiff had not filed a reply brief concerning this motion. Finally, also on April 7, 2009, the defendants filed a motion for leave to file their reply brief in support of their motion for summary judgment *instanter*. Docket at 72. The plaintiff has not filed a separate response to this particular motion.

For the reasons discussed below, the plaintiff's motion to strike the defendants' reply brief is DENIED; the defendants' motion for leave to file their reply brief *instanter* is DENIED AS MOOT; the defendants' motion to strike the testimony of Dr. Nikkalyn Delaurentis is DENIED; and the defendants' motion for summary judgment is GRANTED in part and DENIED in part.

## I. FACTUAL BACKGROUND

The facts giving rise to this lawsuit are tragic. On July 23, 2006, Melissa Puza, who was 29 years old and the mother of four children, was incarcerated as a pretrial detainee in the Porter County Jail in Valparaiso, Indiana. Puza was arrested on that date on charges of possession of a controlled substance, possession of drug paraphernalia, and criminal trespass. During a body search conducted as part of the Jail's processing procedure, officers found "crack" cocaine concealed in Puza's vagina. Puza was placed in a standard holding cell with other inmates and/or detainees. On July 24, Puza was placed in a medical isolation cell after other prisoners in the holding area alerted jail staff that she was vomiting. At 10:20 p.m. on that date, Puza was

found unresponsive in her cell and transported to a hospital, where she later died due to cardiac dysrythmia as a result of cocaine toxicity.

Nadolski was appointed Personal Representative of the Estate of Ms. Puza and brought this lawsuit on based on 42 U.S.C. § 1983, alleging that the defendants are liable for damages for her death. He also asserts claims on behalf of Puza's four children under the Indiana Survival statute, I.C. 34-9-3-4, and a claim under the Indiana Wrongful Death statute, I.C. 34-23-1-1. Nadolski alleges that the Porter County Sheriff's Department is liable under § 1983 for having denied Puza adequate medical care while she was incarcerated. Nadolski also alleges that Michael Hunnicut, an officer with the Sheriff's Department, is liable because he was deliberately indifferent to Puza's serious medical condition.[2] In their motion for summary judgment, the defendants raise numerous defenses they claim entitle them to judgment as a matter of law. Additional facts will be discussed below as they become relevant to the court's analysis and discussion.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Disputes concerning

---

[2] Nadolski originally brought this action in the Porter Superior Court on May 1, 2007. The defendants removed the case to this court on May 18, 2007. The original Complaint named David Lain, the Porter County Sheriff, and the Porter County Board of Commissioners as defendants as well as Hunnicut and the Sheriff's Department. The Sheriff, in his personal and official capacity, and the Board of Commissioners filed a joint motion to dismiss the claims against them. This court converted that motion to a motion for partial summary judgment and granted it in a written order issued on August 24, 2007. *See* docket at 22. The case now proceeds only against Hunnicut and the Porter County Sheriff's Department.

material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.,* 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex,* 477 U.S. at 322; *Ziliak v. AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir. 2003). A failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323.

The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Celotex,* 477 U.S. at 325. A plaintiff's self-serving

statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee,* 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan,* 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1295 (7th Cir. 1993).

## III. DISCUSSION

**A. Plaintiff's "Motion to Strike Defendants' Reply in Support of Their Motion for Summary Judgment as Untimely Filed" and Defendants' "Motion for Leave to File Their Reply in Support of Their Motion for Summary Judgment, *Instanter*."**

Nadolski wants the court to strike the defendants' reply brief because it was filed late. Motion to Strike, p. 1. Nadolski points out that the defendants' reply brief was due to be filed on April 2, 2009, but was not filed until April 3. *Id.*, pp. 1-2. On April 7, the defendants filed their Motion for Leave to File their Reply Brief in Support of their Motion for Summary Judgment, *Instanter*. On that same date, the defendants filed their response to Nadolski's motion to strike. In their response, the defendants offer a *mea culpa*, stating that the late filing of their reply brief was "due to a clerical error." Defendant's Response to Motion to Strike, p. 2. The defendants also argue that "the delay of one day was not done in bad faith nor does it amount to prejudice to the Plaintiff." *Id.* The defendants also contend that "denying [them] the ability to reply to Plaintiff's Response in Opposition to the Defendants' Motion for Summary Judgment would amount to undue prejudice to Defendants." *Id.*

Filing deadlines, whether established by the Federal Rules, Local Rules, or by Order of this court, are expected to be strictly adhered to since they are established for the benefit of both parties as well as the court. Such deadlines help ensure the efficient management of the case.

That said, Nadolski is requesting an extraordinary remedy given the minor (if not insignificant) nature of the defendants' infraction. Tellingly, Nadolski does not argue in his motion to strike that he was somehow prejudiced by the one day delay in the filing of the defendants' reply brief. Also, this case is hotly contested and replete with factual disputes and legal issues. Striking the defendants' reply brief for a minor mistake would deny them the opportunity to fully present their arguments and would deny the court the benefit of a fully briefed motion for summary judgment. For these reasons, the plaintiff's motion to strike the defendants' reply brief in support of their motion for summary judgment is DENIED. As a result of this court's denial of the plaintiff's motion to strike, and the fact that the defendants' reply brief was already filed and docketed in this case (see docket at 70), the defendants' motion for leave to file *instanter* is DENIED AS MOOT.

**B. Defendants' Motion to Strike Deposition Testimony of Dr. Nikkalyn Delaurentis.**

The defendants move the court to strike the testimony of Dr. Nikkalyn Delaurentis, an expert witness designated by the plaintiff. Defendants' Motion to Strike, docket at 67. The defendants contend that the testimony "does not meet the requirements of Federal Rule of Evidence 702 or *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 . . . (1993)." *Id.*, p. 1. In addition, the defendants argue that Nadolski "fails to show in his [response to the defendants' motion for summary judgment] how Delaurentis is qualified to render the opinions contained therein." *Id.*, p. 2.

Federal Rule 702 states, in relevant part, as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon

6

significant facts or data, (2) his testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The *Daubert* case and its progeny mandate that the trial court assess any proposed expert testimony to ensure that it meets the requirements for admissibility under Fed.R.Evid. 702. *Daubert*, 509 U.S. at 597. In *Daubert* the Supreme Court explained that the standard under Federal Rule of Evidence 702 does not depend upon whether the proposed evidence is "generally accepted," but requires that the evidence be reliable and relevant. The Court established the district courts as the "gatekeepers" for determining whether the proffered evidence meets the Federal Rule of Evidence 702 standard. As explained by the Court, "faced with a proffer of expert scientific testimony ... the trial judge must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592, 113 S.Ct. 2786. "This entails a preliminary assessment of whether the reasoning or methodology . . . can be applied to the facts in issue." *Id.* at 592-93, 113 S.Ct. 2786. The Court stated that in order to "qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method." *Id.* at 590, 113 S.Ct. at 2795.

To assist the district courts in performing their gatekeeper role, the Supreme Court in *Daubert* listed four non-exclusive factors to be considered: (1) whether the theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a known or potential rate of error; and (4) whether it has been generally accepted within the scientific community. *Id.* at 592-94, 113 S.Ct. 2786.

The defendants argue that Delaurentis's "opinions are not the product of reliable principles and methods and she has not applied the principles and methods reliably to the facts of the case. The portions of Delaurentis's deposition testimony cited by the Plaintiff in his reply contain a regurgitation of facts and a multitude of conclusions on ultimate issues of fact without any scientific basis or explanation based on the witness's alleged expertise, training, education, knowledge, skill, or experience." Defendants' Motion to Strike, p. 3. The defendants maintain that Delaurentis is unqualified to testify about medical procedures in a jail setting since she has never practiced medicine in such a setting and she admits she is not familiar with any state or federal laws concerning the standard of care that must be provided to prisoners and/or detainees. Defendants' Memorandum in Support of Motion to Strike, pp. 3-4. The defendants also argue that "Delaurentis's deposition [testimony] does nothing to assist a trier of fact in determining the issues. In the instant matter, the pertinent inquiries as they relate to these Defendants are: (1) whether . . . Hunnicut was deliberately indifferent to a serious medical need of Puza; (2) whether the Porter County Sheriff's Department had a policy, custom or practice of denying medical care to its detainees; and (3) whether a failure to train the corrections officers in responding to the medical needs of the jail's detainees resulted in a deprivation of Puza's constitutional rights." *Id*., pp. 4-5. According to the defendants, Delaurentis's testimony "does not aid a trier of fact in answering or understanding any of these questions. The defendants state that "to prove deliberate indifference, Plaintiff must show that Defendants were subjectively aware of the substantial risk of a serious harm to Puza and disregarded it. . . . Delaurentis's opinions make no mention of the subjective belief of corrections officer Hunnicut." *Id*., p. 5. Finally, the defendants argue that "Delaurentis does not testify as to any other similar instances of

constitutional injury due to custom or policy in the jail that may tend to establish a widespread and unconstitutional custom, policy or procedure on the part of the Porter County Sheriff's Department, nor does she offer any testimony regarding the training of jail staff." *Id.* For these reasons, the defendants maintain that the testimony of Delaurentis should be barred under Fed.R.Evid. 702 and *Daubert*.

In his response, Nadolski argues that "Dr. Nikkalynn Delaurentis is testifying as an expert in emergency care, substance abuse and its effects, and the signs, symptoms and consequences of overdosing on cocaine. . . . She is not, at this time, testifying as an expert in jail medical care.[3] Her testimony will assist the trier of fact in assessing the medical aspects of this case. . . . She is a physician with extensive experience in the areas to which she is testifying, and she applied her experience, principles and methods to the facts of this case." Plaintiff's Response to Defendants' Motion to Strike, docket at 74, pp. 1-2.

In their reply brief, the defendants reiterate that, notwithstanding the fact that Delaurentis is a physician, "she has absolutely no experience with the care or treatment of individuals in a jail or corrections setting." Defendants' Reply in Support of Motion to Strike, docket at 75, p. 3. The defendants also argue that by presenting the testimony of Delaurentis, Nadolski is attempting "to spin this lawsuit into a medical malpractice claim." *Id.*, p. 5. Finally, the defendants point out that during her deposition, Delaurentis, after admitting that she was not

_____

[3] Nadolski attached to his response brief a copy of Dr. Delaurentis's curriculum vitae, which reveals that she is the Medical Director of Heartland Hospice in Portsmouth, Ohio, and an urgent care physician at the Adena Regional Medical Center in Chillicothe, Ohio. Delaurentis holds a Doctor of Osteopathic Medicine (D.O.) degree from Midwestern University: Chicago College of Osteopathic Medicine. The defendants, however, do not challenge Dr. Delaurentis's medical education or training in their motion to strike her testimony.

versed or trained as to the standard of medical care the law mandates should be provided to jail inmates or detainees, stated that she believed it is the same standard of care that must be provided in a conventional hospital setting. *Id.*, p. 3. The defendants point out, correctly, that "'[u]nder the Eight Amendment, [plaintiff] is not entitled to demand specific care.'" *Id.* (quoting *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997)). It is well established that pretrial detainees are entitled to reasonable medical care and that jail officers and officials must take reasonable measures to prevent a substantial risk of harm to a detainee. *Williams v. Rodriguez,* 509 F.3d 392, 401 (7th Cir. 2007) The defendants are correct that the standard of medical care that must be provided to such detainees does not necessarily have to be equivalent to what a patient would receive in a standard hospital or clinical setting, so long as the care rendered was not "blatantly inappropriate." *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)). In that respect, Delaurentis's statement during her deposition that, in her opinion, Puza would have been entitled to the same level of medical care in the Porter County Jail that she would have received in a hospital is a misstatement of the law. Such a conclusion or opinion should not be permitted at trial since it could mislead the jury. For purposes of the present motion for summary judgment, however, the court will simply not consider the statement since it is not relevant to the court's analysis.[4]

The court refuses, however, to strike Delaurentis's testimony entirely. While the defendants are correct that Delaurentis is not qualified to offer opinion or conclusions

---

[4] The court notes that the plaintiff did not offer Delaurentis's opinion concerning the standard of medical care required in jails or prisons to support any of this arguments. Instead, Delaurentis expressed this opinion while answering questions from defense counsel during her cross-examination.

concerning Hunnicut's subjective beliefs concerning Puza's medical condition, or opinion or conclusions concerning whether any failure on the part of the Sheriff's Department to train its personnel properly resulted in the denial of Puza's constitutional rights, she is qualified to testify about the emergency medical effects of cocaine ingestion, the effects of cocaine overdose, the symptoms of cocaine intoxication, and perhaps other medically based facts, opinions, and conclusions concerning how cocaine intoxication would affect a woman of Puza's age and physical condition. In fact, testimony from a medical professional will likely be crucial in a case such as this. Competent medical testimony about the effects of cocaine ingestion, intoxication, and overdose will assist the jury in understanding what happened to Puza, why she experienced the symptoms she did on the day of her death, and, ultimately, whether Hunnicut deliberately ignored a serious health condition that Puza was experiencing and/or whether the Sheriff's Department properly trained its jail personnel to identify and respond to such a situation. This is not to say that Delaurentis or any other medical expert will be permitted to offer an opinion or conclusion on those ultimate issues, but such witnesses can certainly aid the jury in understanding the medical issues at play in this case. The extent to which the court will allow such expert testimony and/or the restrictions the court might place on such testimony will no doubt be addressed by way of pretrial motions in limine and the court's ruling on any such motions. But for purposes of the present motion for summary judgment, the court will consider the testimony elicited from Delaurentis to the extent it is probative of any issue presently before the court. For these reasons, the defendants' motion to strike Delaurentis's deposition testimony in its entirety is DENIED.

**C. Defendants' Motion for Summary Judgment.**

Hunnicut and the Sheriff's Department base their motion for summary judgment on several different theories. Hunnicut asserts that he is entitled to summary judgment on Nadolski's claim against him under 42 U.S.C. § 1983 since he "was not deliberately indifferent to Melissa Puza's medical needs." Defendants' Memorandum in Support of Motion for Summary Judgment ("Defendants' Memorandum"), docket at 59, p. 18. Hunnicut also argues that he is entitled to qualified immunity, which bars any § 1983 claim against him. *Id.*, p. 25. The Sheriff's Department argues that it is entitled to summary judgment because "the undisputed facts establish that the Department did not have a custom, policy or practice of denying inmates medical care" and did not fail to train its employees properly. *Id.*, pp. 26-28. In addition, both Hunnicut and the Sheriff's Department argue that they are entitled to immunity from any claims under the Indiana Wrongful Death statute or the Survival statute. *Id.*, pp. 31-33. Finally, both defendants assert that Nadolski's claims are barred by the doctrine of *res judicata*. *Id.*, pp. 33-36.

**1. Claims Against Hunnicut Under 42 U.S.C. § 1983.**

Hunnicut was employed as a Corrections Officer at the Porter County Jail at the time of the incidents giving rise to this lawsuit. Defendants' Memorandum, p. 11. Hunnicut was on duty from 3:00 p.m. until 11:00 p.m. on July 24, 2006. *Id.* When Puza was processed into the Jail she was searched pursuant to standard intake protocol. During that search, crack cocaine was found inside Puza's vagina. Plaintiff's Response to Motion for Summary Judgment ("Plaintiff's Response"), p. 8. As stated above, once inmates informed Jail personnel that Puza was vomiting she was moved to a separate cell, which also was equipped with an in-cell surveillance camera that allowed staff to monitor Puza on video. *Id.* On the videotape, Puza can

be seen tossing about on a bed or cot, and is also seen vomiting several times.[5]  At approximately

7:35 p.m. on July 24, Puza either rolls or falls off her cot and onto the floor.  Nadolski maintains

that "no staff member ever took Puza's vitals, otherwise examined Puza, or provided even

cursory medical treatment."  *Id.*, pp. 8-9.

*Farmer v. Brennan,* 511 U.S. 825 (1994), teaches that a "prison official's deliberate

indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment."

*Id.* at 828 (internal quotation omitted).  A claim of deliberate indifference includes an objective

component and a subjective component.  First, the risk must be objectively serious, "one that

society considers so grave that to expose any unwilling individual to it would offend

contemporary standards of decency."  *Christopher v. Buss,* 384 F.3d 879, 882 (7th Cir. 2004)

(emphasis in original); *see Farmer,* 511 U.S. at 832-34.  Second, prison officials must have

known of and disregarded the "excessive" risk of harm to the inmate.  *Farmer,* 511 U.S. at 832-

37.  Negligence alone will not satisfy the requirements of deliberate indifference.  *Davidson v.

Cannon,* 474 U.S. 344, 347-48 (1986).

Pretrial detainees have a right to adequate medical care under the Fourteenth

Amendment.  *See Williams v. Rodriguez,* 509 F.3d 392, 401 (7th Cir. 2007).  Claims of

inadequate medical care under the Fourteenth Amendment are analyzed using the same standard

for deliberate indifference employed for an Eighth Amendment claim.  *Id.*  To succeed on such a

claim for a pretrial detainee such as Puza, Nadolski must prove that Puza had a serious medical

need and that the defendants were deliberately indifferent to the need.  *See Estelle v. Gamble,*

---

[5]  The videotapes were converted to DVD format and submitted as evidence by the
plaintiff.  The DVDs were, obviously, filed manually, as noted at docket entry 63.  The court
reviewed the videotapes in their entirety.

429 U.S. 97, 105-06 (1976); *Hayes v. Snyder,* 546 F.3d 516, 522 (7th Cir. 2008).  Deliberate indifference is a high standard requiring a plaintiff to prove that the defendants were aware of facts from which a substantial risk of serious harm could be inferred and that they actually drew that inference.  *See Farmer,* 511 U.S. at 837; *Hayes,* 546 F.3d at 522.  "[I]t is important to emphasize that medical malpractice, negligence, or even gross negligence does not equate to deliberate indifference."  *Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir. 2006).  "Mere dissatisfaction or disagreement with a course of treatment is generally insufficient; [the courts] will defer to a medical professional's treatment decision unless 'no minimally competent professional would have so responded under those circumstances.'"  *Id.* (internal citation omitted).

Hunnicut maintains that he was not subjectively aware of any serious medical need Puza had during her detention, and that he therefore was not deliberately indifferent to that need. Defendants' Memorandum, pp. 18-22.  In support of this argument, Hunnicut claims that he "does not have any medical training besides the training he received in his corrections officer training."  *Id.*, p. 18.  He claims that he "relied on the opinions of the medical experts in the jail to render medical care to the detainees."  *Id.*  He admits, however, that he "had authority to render medical care to detainees at the Porter County Jail as a first responder . . ." and that his "first responder duties are CPR and first aid."  *Id.*  He states that he "was not trained in monitoring patient vitals such as temperature or blood pressure."  *Id.*, p. 19. (Curiously, however, his training did include learning how to use an electronic defibrillator.  *Id.*)  Hunnicut further states that when he "came on shift on July 24, 2006 at 3:00 p.m. he was not told anything about Puza's condition. . . ."  He "was not present at the Porter County Jail when Puza arrived. . .

." He "was not present when Puza was booked into the jail[.] . . ." and "he was not aware that Puza came in to the jail with contraband concealed on her person. . . ." *Id.* (citing portions of the Deposition of Michael Hunnicut, Defendants' Exhibit I). The defendants concede that there are video cameras located in various places in the jail, including the medical isolation cell where Puza was eventually placed (and where she was housed during Hunnicut's shift). However, Hunnicut claims that "[t]here is not one officer constantly watching the monitors that monitor medical isolation." *Id.*

Hunnicut claims that "[t]he only times that [he] personally observed Puza was when he performed his watch tour checks at approximately 9:46 p.m. and 10:20 p.m." *Id.*[6] In the course of conducting these "watch tours," Hunnicut "would look into each cell and check on everyone. . . . On his first watch tour . . . Hunnicut observed inmate Puza lying on the floor on her stomach with her head turned to the side. . . . Hunnicut checked Puza to see if she was breathing[.]" and he "observed chest movements and could hear breaths. . . . He stood observing Puza for one to two minutes. . . ." *Id.*, pp. 19-20. According to his deposition testimony, Hunnicut was not alarmed by the fact that Puza was lying on the floor, since "it was cooler on the floor than in the higher level in the cell[.]" and it was not uncommon to see detainees lying on the floor. *Id.*, p. 20. Hunnicut claims that when he first saw Puza he did not detect any medical problem and that "[n]o one working at the Porter County Jail on July 24, 2006 ever gave [him] any indication that Puza was in need of medical attention." *Id.* Finally, Hunnicut states that "Puza herself never

---

[6] Oddly, the defendants later write in their brief that "Officer Hunnicut monitored the Plaintiff's decedent hourly in accordance with jail protocols." Defendants' Memorandum, p. 21. This statement seems directly at odds with Hunnicut's assertions that he only observed Puza twice during his shift and that neither he nor any other officer maintained a constant watch of the jail's in-house video system.

gave Hunnicut any indication that she was in need of medical attention[.]" and his own "observations of Puza did not make him believe that Puza was going through withdrawal." *Id*.

Hunnicut claims he next observed Puza at 10:20 p.m. during his second "watch tour," when he noticed that she was lying on the floor in the same position and appeared not to be breathing. *Id*., p. 21. Hunnicut notified other confinement officers and began to administer CPR. *Id*. Another officer contacted emergency medical services (EMS), which arrived soon and transferred Puza to Porter County Hospital. *Id*. Hunnicut rode in the ambulance with Puza to the hospital. *Id*. Puza was declared dead at 11:25 p.m. and her death was determined to be the result of cardiac dysrhythmia due to cocaine toxicity. *Id*., p. 22 (citing Indiana Department of Health Certificate of Death, Defendants' Exhibit L; Plaintiff's Exhibit 6). Hunnicut maintains that these "undisputed facts in the record establish that Officer Hunnicut was not subjectively aware of a substantial risk of serious harm to Puza as he was unaware that Puza was in need of medical care whatsoever until the time he discovered her unresponsive." *Id*., p. 20.

Based on this version of the factual scenario, Hunnicut argues that he was not subjectively aware that Puza had any medical problem and that he was not deliberately indifferent to her medical needs, and is entitled to summary judgment in his favor on Nadolski's claim against him under 42 U.S.C. § 1983.

In his response brief, Nadolski challenges Hunnicut's version of the facts–and his assertion that he was unaware that Puza had a serious medical problem–by presenting the testimony of Emily Mierwa, who was a cellmate of Puza's, and the testimony of Bill Steele, who was a trustee in the jail. Mierwa testified in her deposition that on the morning of July 24, she observed Puza vomiting, noticed that one of Puza's eyes was dilated, and that Puza was not

engaging in lucid conversation. Plaintiff's Response, pp. 23-24 (citing portions of deposition of Mierwa, Plaintiff's attachment 1, pp. 36-53). A few hours later, Mierwa noticed Puza's eyelids "fluttering" and "her eye would be like rolling around in her head." Mierwa Deposition, p. 42. At some point late in the morning on July 24, another cellmate named Tonya began pressing the in-cell intercom button to alert jail staff that Puza was ill and vomiting. *Id*., p. 43. Mierwa testified that no jail staff arrived to check on Puza for "a couple of hours . . . ." *Id*. At that point, a nurse by the name of Ms. Dobson came to check on Puza but determined that she was okay and did not administer any medical care. *Id*., p. 44. Dobson returned about one hour later and informed Mierwa that Puza "was fine and that she was just pregnant and dope sick . . . ." *Id*., p. 45. Once again, according to Mierwa, Dobson did not provide any medical treatment for Puza, and did not take Puza's blood pressure or temperature. *Id*. About one hour after lunch time on that same day, Mierwa and other inmates began "pressing the [intercom] button repeatedly all day to no avail[.] . . . because at this time Melissa's actions were becoming more erratic. She is dry heaving. This is when she really started to stare in space, become unresponsive." *Id*., p. 47. Finally, several hours after Mierwa and Tonya began pressing the intercom button and alerting staff to what they felt was Puza's serious and deteriorating condition, Dobson and another staff member removed Puza from the holding cell. *Id*., p. 53. When they did so, Dobson ordered Puza to "walk over here. We are going to take you out." *Id*. According to Mierwa, Puza replied, "I can't." Dobson then allegedly said, "what do you mean you can't? Of course you can." *Id*. Mierwa stated that Puza then "stumbled . . . across the room to the wall from her bed, which was maybe a couple feet, and braced herself along the wall . . . and she kind of stumbled to the door." *Id*.

Bill Steele testified that he personally observed Puza while assisting jail guards in serving dinner to inmates and detainees. Plaintiff's Response, Attachment 1, deposition of Bill Steele, pp. 55-56. By this time, Puza had already been placed in a medical isolation cell. *Id.*, p. 56. When Steele returned to Puza's cell to retrieve her dinner plate, he noticed that "she was laying next to the toilet like, you know, not moving. And I had told the guard, Hey, you know, there's something wrong with, you know, this inmate." *Id.* Steele, who stated that he worked for ten years as an emergency medical technician (*id.* at 57) testified that Puza "was vomiting, she was pale, she was moving real slow, shaking." *Id.*, p. 58. Steele advised a guard (*not* Hunnicut) of Puza's condition and the officer told Steele that Puza was "just dope sick and he just left her. He didn't get on his radio and call for help. There's a phone in there, he didn't call on the phone. The nurse's station is outside medical five feet [sic]. The door right across–right across the hall. He didn't go in there and tell the nurse nothing [sic]. He just went back to . . . where he was stationed." *Id.*

The testimony of Mierwa and Steele make no mention of Hunnicut. Nonetheless, Nadolski presents this evidence and argues that it "proves" that Hunnicut must have been subjectively aware of Puza's serious medical condition since that condition began deteriorating quite seriously and dramatically several hours before Hunnicut began his shift. Plaintiff's Response, p. 23. Also, Nadolski points out that Hunnicut admitted in his deposition that he first observed Puza at approximately 5:00 p.m. during the dinner service, rather than at 9:46 as represented in the defendants' brief. *Id.*, p. 22 (citing Attachment 1, deposition of Michael Hunnicut, p. 29). Hunnicut also testified that "Ms. Puza did not complain to us of being ill at the

time when we did med pass and dinner." *Id*., p. 23; Hunnicut Deposition, p. 33. In addition, Hunnicut testified that "watch tours" were conducted hourly "from the 8:00 to 9:00 p.m. watch tour; the 9:00 to 10:00 p.m. watch tour; and the 10:00 to 11:00." *Id*. According to Nadolski, these statements by Hunnicut conflict not only with Hunnicut's earlier assertion that he only observed Puza twice (once at 9:46 and then at 10:20), but also with the testimony of Mierwa and Steele and "create[] and issue of fact as to whether . . . Hunnicut [was] subjectively aware of Puza's serious medical needs." *Id*.

The difficulty with Nadolski's argument is twofold: first, as stated, neither Mierwa nor Steele mention that any of their concerns about Puza were relayed, either directly or indirectly, to Hunnicut; and second, Nadolski's argument that Hunnicut "would have seen Puza in this condition and dinner and during his watch tour[.]" is presumptive. Thus, this evidence does not "prove" that Hunnicut was deliberately indifferent to Puza's medical needs, as Nadolski argues. On the other hand, the evidence does raise credibility issues. That is, what precisely did Hunnicut know and when did he know it? Nadolski claims that Mierwa's and Steele's testimony reveals that Puza was in serious distress beginning in the morning of the day she died, whereas Hunnicut alleges he did not observe any problem with her during the dinner hour, at 9:46 p.m. when he saw her lying on the floor of the medical isolation cell, or at any point in between. Then, at 10:20 p.m., Hunnicut noticed that Puza was not breathing, he called for help, and began administering CPR.

The facts of this case raise many questions. Notwithstanding Hunnicut's assertion that it is not uncommon for inmates or detainees to lie on the floor, Hunnicut's testimony regarding his actions when he observed Puza at 9:46 p.m. are curious. Puza was lying on the concrete floor

next to her cot, and Hunnicut testified that he stood outside her cell for one to two minutes to make sure she was breathing. When he noticed her chest moving, he left without doing anything further. Nadolski argues that "[t]here would be no other good reason for Hunnicut to stand at the door for 2 minutes to see if Puza was breathing if he didn't think she was in serious need of medical attention." *Id.*, p. 28. That conclusion might be a stretch, especially since a jury could believe Hunnicut's claims that he knew nothing at all about any medical problem Puza was experiencing and didn't even know that she was being detained for drug possession. On the other hand, Hunnicut's actions beg the question, why did he simply stand outside Puza's cell (which after all was a medical isolation cell) to determine whether she was breathing, as opposed to entering the cell and attempting to assess her condition?

It is well established that a court may not (indeed, *cannot*) make credibility determinations when analyzing and ruling on a motion for summary judgment. But Hunnicut's credibility is at the heart of his defense that he was completely unaware that Puza had a serious medical problem. Only a jury can resolve this fact question, after hearing Hunnicut's testimony and assessing his credibility. For this reason, the court will deny Hunnicut's motion for summary judgment on Nadolski's claim that Hunnicut was deliberately indifferent to Puza's serious medical needs.

Hunnicut also argues that he is entitled to qualified immunity from Nadolski's claims. Qualified immunity shields government employees from liability for civil damages arising from actions within the scope of their employment unless their conduct violated "clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *accord Thomas v. Ramos,* 130 F.3d 754, 763 (7th Cir. 1997).

Qualified immunity is an " *immunity from suit* rather than a mere defense to liability," *see*

*Mitchell v. Forsyth,* 472 U.S. 511, 526-27 (1985). A court analyzes a defendant's claim of

qualified immunity by determining (1) whether the facts alleged, "[t]aken in the light most

favorable to the party asserting the injury, . . . show the officer's conduct violated a

constitutional right"; and (2) whether the right was clearly established at the time of its alleged

violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Stated differently, even if the court

concludes that the defendant's alleged actions were improper to the point of being

unconstitutional, the defendant is still entitled to qualified immunity unless the

unconstitutionality of the actions was clearly established at the time of their occurrence. *Id.*

"In determining whether a constitutional right has been clearly established, it is not

necessary for the particular violation in question to have been previously held unlawful.

*Anderson v. Creighton,* 483 U.S. 635, 640 (1987); *see also Mitchell,* 472 U.S. at 535 n. 12

(holding that a clearly established right does not require judicial precedent to that effect).

Instead, a clearly established constitutional right exists in the absence of precedent, where "the

contours of the right [are] sufficiently clear that a reasonable official would understand that what

he is doing violates that right." *Anderson,* 483 U.S. at 640. To that extent, government officials

are considered "on notice" that conduct is violative of established law if the state of the law at

the time gave them "fair warning" that their conduct would be unconstitutional. *Hope v. Pelzer,*

536 U.S. 730 (2002). Pursuant to constitutional requirements, a pretrial detainee "may not be

punished prior to an adjudication of guilt in accordance with due process of law." *Bell,* 441 U.S.

at 535.

"Although the Eighth Amendment does not apply to pretrial detainees, pretrial detainees

are entitled to *at least* as much protection as the constitution provides convicted prisoners. *See Cavalieri v. Shepard,* 321 F.3d 616, 620 (7th Cir. 2003). The Eighth Amendment protects an inmate from a governmental actor's "deliberate indifference to his basic needs." *Id.* at 620. Under this standard, conduct is "deliberately indifferent" when the official has acted in an intentional or criminally reckless manner, *i.e.,* "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Armstrong v. Squadrito,* 152 F.3d 564, 577 (7th Cir. 1998) (quoting *West v. Waymire,* 114 F.3d 646, 651 (7th Cir. 1997)). In *Armstrong,* the appellate court noted that "[u]nder other constitutional provisions [such as the Fourteenth Amendment] . . . the standard for deliberate indifference appears closer to tort recklessness." *Id.* In recognition of this, the Seventh Circuit has articulated the test for deliberate indifference for Fourteenth Amendment purposes to be "a conscious disregard of known or obvious dangers." *Armstrong,* 152 F.3d at 577 (quoting *West,* 114 F.3d at 651). However, considering "the difficulty of peering into minds [of government officials or institutions]," this distinction is of little significance in practical application. *West,* 114 F.3d at 651. Thus, it is convenient and entirely appropriate to apply the same standard to claims arising under the Fourteenth Amendment (detainees) and Eighth Amendment (convicted prisoners) "without differentiation." *Henderson v. Sheahan,* 196 F.3d 839, 845 n. 2 (7th Cir. 1999); *See Higgins v. Correctional Med. Servs. of Illinois, Inc.,* 178 F.3d 508, 511 (7th Cir. 1999); *see also Mathis v. Fairman,* 120 F.3d 88, 91 (7th Cir. 1997). In either case the plaintiff has the burden of showing that: (1) the harm to the plaintiff was objectively serious; and (2) the official was deliberately indifferent to her health or safety. *Cavalieri,* 321 F.3d at 620; *see also Farmer v. Brennan,* 511 U.S. 825, 834-37 (1994).

Hunnicut argues that "the undisputed facts establish that Hunnicut's actions did not violate Puza's constitutional rights[.]" and that "[t]he objective reasonableness of Hunnicut's conduct is unquestionable in this case . . . ." Defendants' Memorandum, p. 34. Accordingly, he states, he is entitled to qualified immunity.

There is no question that a detainee's right (or an inmate's right) to receive reasonable medical attention for a serious medical condition is a long and well-established constitutional right. *Board v. Farnham, et al.*, 394 F.3d 469, 481 (7th Cir. 2005). For purposes of the present motion for summary judgment, the defendants' concede that Puza had a serious medical condition. The issue, then, is whether Hunnicut was deliberately indifferent to that condition. Given the court's conclusion that Hunnicut is not entitled to summary judgment on the § 1983 claim against him, he is likewise not entitled to qualified immunity. The issue of whether he was deliberately indifferent to Puza's medical needs turns on credibility, as the court has already discussed. In his response brief, Nadolski, when addressing the issue of qualified immunity, reiterates much of his factual recitation he presents with regard to the § 1983 claim against Hunnicut. Nadolski then concludes by stating that "[r]eviewing the facts of this case as they are considered most favorable to the plaintiff, this Honorable Court should conclude that there is sufficient evidence to determine that the plaintiff has alleged an objectively serious harm, and that Hunnicut was deliberately indifferent to [Puza's] serious need for medical assistance." Plaintiff's Response, p. 39. The court agrees with Nadolski's position. Considering the factual scenario in a light most favorable to the plaintiff, and resolving all factual disputes in favor of the plaintiff, makes it clear that genuine issues of material fact preclude the entry of summary

judgment in favor of Hunnicut on the basis of qualified immunity.

### 2. Claims Against Porter County Sheriff's Department Under 42 U.S.C. § 1983.

The Seventh Circuit Court of Appeals has explained the parameters under which a

municipality (or governmental unit such as a county sheriff's department) can be held liable for

constitutional violations in an action under § 1983:

> "While a municipality is not vicariously liable under § 1983 for the acts of its employees, a constitutional deprivation may be attributable to a municipality 'when execution of a government's policy or custom ... inflicts the injury.'" *Montano v. City of Chicago,* 535 F.3d 558, 570 (7th Cir. 2008) (citing *Monell,* 436 U.S. at 694, 98 S.Ct. 2018, 56 L.Ed.2d 611, and *Schlessinger v. Salimes,* 100 F.3d 519, 522 (7th Cir. 1996)); *Eversole v. Steele,* 59 F.3d 710, 715 (7th Cir. 1995) ("[M]unicipalities are answerable only for their own decisions and policies; they are not vicariously liable for the constitutional torts of their agents."). "A local government unit's unconstitutional policy or custom can be shown by: (1) an express policy causing the loss when enforced; (2) a widespread practice constituting a 'custom or usage' causing the loss; or (3) a person with final policymaking authority causing the loss." *Walker v. Sheahan,* 526 F.3d 973, 977 (7th Cir. 2008).

*Houskins v. Sheahan,* 549 F.3d 480, 493 (7th Cir. 2008).

The Sheriff's Department argues that its policies and procedures for handling the medical

needs of detainees was adequate and proper. The Sheriff's Department states that "[t]he Porter

County Jail has a medical isolation unit and full-time medical staff. . . . There is a medical office

at the Porter County Jail for the medical staff. . . . The Porter County Jail entered into a contract

with Advanced Correctional Healthcare in 2004 to provide better medical care at the jail. . . . A

physician from Advanced Correctional Healthcare comes to the jail once a week to treat

detainees. . . . Advanced Correctional Healthcare provided the Jail with protocols and procedures

that were set out as guidelines to follow in treating inmate's medical needs. . . . the Advanced

Correctional Healthcare protocols were guidelines rather than rules and regulations."

Defendants' Memorandum, p. 22 (citing excerpts of depositions of Porter County Sheriff David

Lain and Porter County Jail Warden John Widup, Defendants' Exhibits N and O, respectively).

In addition, the defendants point out that every person who is processed into the jail is

assessed and "a medical screening report is filled out for every detainee . . . ." *Id*. If it is

determined that a person has a serious medical condition, the jail will not place them in detention

but, rather, will "have the arresting officer take the individual directly to the hospital." *Id*., p. 23

(citing portion of deposition of Dobson). "During the nighttime hours when medical staff is not

present in the building, Medical Director Cheryl Casko is available via telephone and radio." *Id*.

Also, the defendants point out, "[t]here is a call button in each cell including the medical

isolation cells. . . . If a detainee in the jail had a need for medical care, they could push a button

inside their cell." *Id*. (citing Lain deposition). Based on the fact that the Porter County Jail has

these medical procedures and precautions in place, the Sheriff's Department argues that it is

entitled to summary judgment on Nadolski's §1983 claims since "[t]here is no evidence of a

custom, policy or practice of denying detainees medical care." *Id*., p. 35. The Sheriff's

Department argues that Nadolski "has not established a pattern of violations similar to the

alleged violations of Puza's constitutional rights or the Porter County Sheriff's Department's

awareness of such a pattern necessary to show a widespread practice and attach liability under 42

U.S.C. § 1983. Moreover, the Plaintiff has not pointed to a single policy, whether express or

implied, of denying detainees of the Porter County Jail medical care." *Id*.

The Sheriff's Department also argues that Nadolski has failed to establish that the

Department somehow failed to train its staff to handle medical problems properly. *Id*., p. 37.

The Department explains that "[n]ew hires at the Porter County Jail receive six weeks of initial training that covers a broad range of policies, procedures and practices." *Id.*, p. 38. During that training period, new hires spend three weeks in the Jail itself and "are with the Medical Department for at least one day." *Id.* Also, "[d]uring probationary period, the corrections officers have exposure to all sections of the jail including medical isolation. Each new jail officer gets a copy of the Rules and Regulations for the jail and all corrections officers are trained in CPR." *Id.*

In his response, Nadolski argues that there is evidence that the Sheriff's Department had in place certain customs and practices that establish (or at least raise a genuine issue of fact) that detainees in need of medical attention do not receive adequate medical care. Plaintiff's Response, pp. 13-20. For example, Nadolski claims that "[a]t the time of Puza's death, the Porter County Sheriff's Department had a custom and practice of requiring strict proof that a person had been vomiting before the staff would follow the protocol regarding vomiting and nausea." *Id.*, pp. 13-14. Nadolski points out that Warden Widup "testified that it was a custom and practice of the Porter County Jail staff to require inmates to show their vomit if they wanted to receive health care." *Id.*, p. 14 (citing portion of Widup Deposition, attachment 1). Nadolski also notes that Porter County Jail Medical Director Cheryl Casko "confirmed this custom and practice" in her deposition. *Id.*, p. 15. Casko did, indeed, testify that if an inmate or detainee is vomiting and asks for medical attention, the jail staff goes to the cell to ensure that the detainee is vomiting. *Id.*; attachment 2. Since Jail staff did not see any vomit in the holding cell or the medical isolation cell, they did not feel that Puza needed medical attention for that problem.

In this case, Puza's cellmate Mierwa testified that while Puza was vomiting both on the

toilet and on a roll of toilet paper next to it, and while Mierwa and another cellmate informed jail

staff of that fact, there was no vomit visible in the holding cell since Mierwa and another inmate

"had cleaned up the vomit with little napkins." Plaintiff's Response, p. 24 (citing Mierwa

Deposition, p. 44). Mierwa also testified that she placed some napkins "over the pile [of vomit]

that was by [Puza]." *Id*. Even though Mierwa and another inmate relayed this information to

Jail staff, Nurse Dobson did not administer any medical care to Puza when she visited the

holding cell, and told Mierwa that Puza "was fine and that she was just pregnant and dope sick . .

. ." Mierwa Deposition, p. 45. In addition, Nurse Dobson testified that the Jail would not

administer medical care to a detainee who was vomiting unless a staff member actually saw the

vomit. Dobson testified as follows:

> Q. You mentioned about wanting to see Ms. Puza's vomit, for what reason?
>
> A. To prove that she was vomiting, because while I was there she hadn't–she
> wasn't vomiting or anything, and, yes, I did think that something might have been
> wrong, but I have dealt with so many of them you don't really know what they are
> doing. So, until you can actually see–physically see it, we can't really do
> anything because there is so many stories told, and they try to get different things.
> And a lot of them know that if they are going to withdraw from drugs they try to
> say–they know what to say to try to get the withdrawal drugs, so until we actually
> see it there is nothing that we can really do.

*Id*., p. 17 (quoting Dobson Deposition, p. 26.

Nadolski argues that this testimony establishes "that Dobson was enforcing the express

policy of the Porter County Sheriff's Department of requiring inmates complaining of nausea

and vomiting to show vomit before receiving medical care, even in cases where the inmate's

cellmates are advocating for the sick inmate, and the inmate is found sitting next to a toilet." *Id*.

Nadolski alleges that this policy or custom of requiring an inmate or detainee to show their vomit

to Jail staff before medical care will be rendered resulted "in the deprivation of Puza's

constitutional rights.  In Puza's case, Puza could not prove she was vomiting to the satisfaction

of the jail staff, which had the obvious consequence of placing her at an excessive risk of harm . .

. ."  *Id*., p. 15.  Nadolski also reiterates that Puza can be seen vomiting, or at least appears to be

vomiting, several times in the videotapes.[7]  *Id*., p. 19.  Despite that, and despite the fact that the

medical isolation cell was equipped with a video camera, no one administered medical care to

Puza.

In addition to Nadolski's allegation that the Sheriff's Department had a custom or policy

of not treating inmates or detainees who complain of vomiting unless staff members actually see

the vomit, Widup's testimony revealed another very troubling policy (or lack of policy).  Widup

testified that corrections officers and other staff members at the Jail were not trained to detect or

identify when a detainee or inmate was suffering from a drug overdose.  Widup testified as

follows:

Q. . . . Your staff does not know how to detect a drug overdose, never been
trained for that, have they?

A.  No.

Q.  And you as Warden of this jail, Sheriff Reynolds, Sheriff Lain, none of the
other administrators you know of has ever once taken one single measure to make

---

[7]  The defendants challenge Nadolski's assertion that the videotapes show Puza vomiting.
The defendants state that "[i]n reality, in observing the video tapes it is impossible to discern
what Puza is doing when she makes several trips to the toilet area as it is blocked by a concrete
partition.  At no time does the video tape actually show Puza vomiting."  Defendants' Reply, p.
11.  However, the court has reviewed the videotapes and, while they are not definitive on this
point (i.e., they do not literally show Puza vomiting), they do seem to indicate–without
employing any degree of imagination–that Puza vomited (or perhaps attempted to vomit) several
times while she was in the medical isolation cell.  In fact, even Hunnicut admitted this in his
deposition, stating that when he reviewed the videotapes after the inception of this lawsuit, he
noted that Puza "[l]ooked like [she was] throwing up[.]" and that she apparently did so several
times.  Hunnicut Deposition, p. 31.

sure that anybody in jail knows how to tell when somebody has overdosed on cocaine?

A. Right.

Plaintiff's Response, Widup Deposition, p. 13.

It is the plaintiff's position that this evidence establishes that the Porter County Sheriff's Department had in place a policy, custom or procedure that resulted in the denial of medical care to Puza and that liability can attach to the Department under § 1983 for that reason. The court concludes that this evidence at least raises a genuine issue of material fact concerning whether the policies or customs of the Sheriff's Department violated Puza's constitutional right to receive adequate medical care for a serious health condition. For these reasons, the court will deny the Sheriff's Department's motion for summary judgment.

### 3. Claims Under Indiana Wrongful Death Statute and Survival Statute.

The defendants argue that Nadolski does not have a viable claim under the Indiana Survival statute or the Indiana Wrongful Death statute. Defendants' Memorandum, pp. 39-44. They state that "[u]nder Indiana law, a claim may be made for either wrongful death OR survival, but not for both." *Id.*, p. 39 (citing *American International Adjustment v. Galvin*, 86 F.3d 1455, 1457 (7th Cir. 1996)) (capitalization in original). The defendants maintain that "[i]f [a] victim dies as a result of [an] accident, the claim is for wrongful death. If the victim dies later from unrelated causes, that case is a survival action." *Id.* (citing *Galvin*). In this case, the defendants argue, Nadolski is alleging that Puza died as a direct result of the acts or omissions of Hunnicut and the Sheriff's Department. Defendants' Memorandum, p. 40. Accordingly, they assert, Nadolski can assert a claim under the Indiana Wrongful Death statute on behalf of Puza's estate, but cannot state a claim under the Survival statute, since that statute provides for damages

29

for pain and suffering the decedent experienced after an accident and before dying as a result of causes unrelated to the accident. Thus, the defendants move for summary judgment in their favor on Nadolski's claim under the Indiana Survival statute.

The Indiana Survival statute, in its entirety, states as follows:

34-9-3-4  Action by decedent's representative based on personal injuries causing death

Sec. 4. (a) This section applies when a person:

(1) receives personal injuries caused by the wrongful act or omission of another; and

(2) subsequently dies from causes other than those personal injuries.

(b) The personal representative of the decedent who was injured may maintain an action against the wrongdoer to recover all damages resulting before the date of death from those injuries that the decedent would have been entitled to recover had the decedent lived. The damages inure to the exclusive benefit of the decedent's estate.

The Indiana Wrongful Death statute states, in relevant part, as follows:

34-23-1-1 Death from wrongful act or omission

Sec. 1.  When the death of one is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action therefor against the latter, if the former might have maintained an action had he or she, as the case may be, lived, against the latter for an injury for the same act or omission.  When the death of one is caused by the wrongful act or omission of another, the action shall be commenced by the personal representative of the decedent within two (2) years, and the damages shall be in such an amount as may be determined by the court or jury, including, but not limited to, reasonable medical, hospital, funeral and burial expenses, and lost earnings of such deceased person resulting from said wrongful act or omission.  That part of the damages which is recovered for reasonable medical, hospital, funeral and burial expense shall inure to the exclusive benefit of the decedent's estate for the payment thereof.  The remainder of the damages, if any, shall, subject to the provisions of this article, inure to the exclusive benefit of the widow or widower, as the case may be, and to the dependent children, if any, or dependent next of kin, to be distributed in the same manner as the personal property of the deceased.

While there is no express language in either of these statutes stating that they are mutually exclusive, Indiana courts have ruled that they are, as the defendants argue. *See Smith v. Johnston*, 854 N.E.2d 388, 389-90 (Ind. App. 2006) (a plaintiff cannot recover under both the Wrongful Death statute and the Survival statute); *Baumgart ex rel. Baumgart v. DeFries*, 888 N.E.2d 199, 207 (Ind. App. 2008) ("'the survival statute precludes recovery on both a wrongful death claim and a survival claim.'") (quoting *Cahoon v. Cummings*, 734 N.E.2d 535, 544 (Ind. 2000)).

The Indiana courts have held repeatedly that a claim under the Survival statute exists when a plaintiff has a cause of action for injuries caused by the defendants in a case, but later dies of an unrelated cause or causes. *Ellenwine v. Fairley*, 846 N.E.2d 657 (Ind. 2006). Put another way, "[t]he Survival [statute] provides that if an individual who has a personal injury claim or cause of action dies, the claim or cause of action does not survive–unless the individual dies from causes other than those personal injuries." *Technisand, Inc. v. Melton*, 898 N.E.2d 303, 305 (Ind. 2008). The Survival statute provides a cause of action for a plaintiff who is injured as the result of the act or omission of another (an automobile accident, for example), but who later dies from unrelated causes (heart disease or cancer, for example). The plaintiff would be entitled to "recover all damages resulting before the date of death from those injuries that the decedent would have been entitled to recover had the decedent lived." However, when a plaintiff alleges that the acts or omissions of another individual or individuals *caused* the plaintiff's untimely death, a cause of action arises *only* under the Wrongful Death statute. In this case, Nadolski alleges that Puza died *due to* the acts and/or omissions of Hunnicut and the

Sheriff's Department. As the defendants point out, Nadolski "has alleged that Puza's death was due solely to the Defendant[s'] negligence. Thus, the applicable statute is the Indiana Wrongful Death act, and the Plaintiff does not have a claim under the Indiana Survival Statute." Defendants' Memorandum, p. 40. Phrased another way, the "Defendants are entitled to summary judgment on the claims brought against them under the Indiana Survival Statute as there is no evidence that Puza died from a cause *other than* the alleged negligence of the Defendants." Defendants' Motion for Summary Judgment, docket at 56, p. 3 (italics added). The defendants' argument is clearly supported by Indiana law and they are therefore entitled to summary judgment on the plaintiff's claim under the Indiana Survival statute.[8]

The defendants next contend that even if a claim under the Indiana Wrongful Death statute is the only such state law claim that Nadolski could bring on behalf of Puza, they are entitled to immunity from any wrongful death claim, pursuant to Indiana Code 34-13-3-3(8) and so are entitled to summary judgment on that cause of action. The statute to which the defendants cite states, in relevant part, as follows:

> 34-13-3-3 Immunity of governmental entity or employee.

---

[8] Nadolski argues in his response that he can maintain a claim under the Indiana Survival statute. Plaintiff's Response, pp. 34-35. He argues that "Puza received personal injuries caused by the wrongful acts or omissions of the Porter County Sheriff's Department and Officer Michael Hunnicut in that her drug overdose was untreated by deliberate indifference. Puza subsequently dies from cocaine toxicity. Therefore, the estate has a viable claim under I.C. 34-9-3-4." *Id.*, p. 35. That is the full extent of Nadolski's response to this issue. While his argument is certainly succinct, it is not well taken. The entire basis for his lawsuit is that Puza's death resulted from the acts and/or omissions of the defendants. He presents the testimony of an expert witness, Dr. Delaurentis, to support his contention that Puza would *not* have died *but for* the acts and/or omissions of the defendants. Consequently, the only state law cause of action Nadolski can bring on Puza's behalf is one under the Wrongful Death statute.

Sec. 3. A governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from the following:
. . .
(8) The adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment.

The Indiana Supreme Court has explained that the scope of the term "enforcement" under § 34-13-3-3(8) is "limited to those activities in which a governmental entity or its employees compel or attempt to compel the obedience of another to laws, rules or regulations, or sanction or attempt to sanction a violation thereof." *Mullin v. Municipal City of South Bend,* 639 N.E.2d 278, 282 (Ind. 1994).

A federal court in the Southern District of Indiana addressed the tort immunity statute and the issue of what constitutes "enforcement" in the case of *Sellers v. Marion County Sheriff's Dept.*, WL1630008 (S.D. Ind. June 27, 2002). In *Sellers*, a police officer was sued under 42 U.S.C. § 1983 after he allegedly used excessive force in effecting an arrest, resulting in the subsequent death of the arrestee. The officer saw the plaintiff's decedent, Mr. Sellers, walking down a street and noticed that Sellers appeared intoxicated. The officer briefly turned on his emergency siren but Sellers did not stop. The officer then pulled into a driveway or parking lot, attempting to "cut off" Sellers and force him to stop to the officer could investigate his condition. During this maneuver, the officer allegedly hit Sellers with his patrol car. Then, the officer (and a second officer who came on the scene), wrestled Sellers to the ground and handcuffed him. At some point during this incident (it was alleged), Sellers received traumatic head injuries and died a few days later. The district court granted the officers' motion for summary judgment on a wrongful death claim included in the lawsuit, reasoning that the officers

33

were, at all times relevant, were acting in the scope of their employment and also were "attempting to compel compliance with the law" by trying to get Sellers to stop and submit to questioning (and later, arrest).  Therefore, the actions of the officers fell within the Indiana Supreme Court's definition of "enforcement."  *Id.*, * 5.

In the present case, Hunnicut attempts to characterize his actions as "enforcing" rules and regulations at the Porter County Jail with respect to ill or allegedly ill inmates.  More specifically, Hunnicut claims his actions were "encompassed within the broad definition of 'enforcement' as he was enforcing and executing the law, specifically governing the conduct of prisoners housed at the Jail."  Defendants' Memorandum, p. 40.  But this is quite a stretch of the Indiana Supreme Court's definition of the term "enforcement" as it is used in the statute and interpreted by the Indiana courts.  Hunnicut's actions, examined in a light most favorable to the plaintiff, do not demonstrate that he was trying to compel Puza to obey some law or to comply with a law.  Instead, he was, at best, merely following the internal procedures of the Jail.  So the situation in this case is very different from the scenario presented in *Sellers*.  Hunnicut presents no cases on point to support his argument that he is entitled to immunity from Nadolski's wrongful death claim under the facts of this case, and this court's own research failed to uncover any such support.  Accordingly, the court determines that Hunnicut is not entitled to immunity under the circumstances in this case.[9]

_____

[9] The Sheriff's Department argues that it is entitled to the same immunity since Hunnicut was in its employ and was acting within the scope of that employment at the relevant time. Since the court has concluded that Hunnicut's alleged acts or omissions did not constitute "enforcement" of the law as that term has been defined by the Indiana Supreme Court in *Mullins*, the Sheriff's Department is likewise not entitled to immunity from the plaintiff's wrongful death claim.

### 4. Defendants' Defense Under Doctrine of *Res Judicata*.

The defendants also argue that they are entitled to summary judgment on all of Nadolski's claims since those claims are barred the doctrine of *res judicata*. Defendants' Memorandum, p. 41. The defendants state that the plaintiff had filed a state court action (other than this one, which originated in state court and was removed to this court) which "also arose out of the detention and death of . . . Melissa Puza. That . . . complaint named a physician from Advanced Correctional Healthcare and Cheryl Casko, the Medical Director of the Porter County Jail, in her capacity as the medical director." Defendants' Memorandum, pp. 41-42. Casko filed a motion to dismiss the claims against her in that lawsuit and her motion was granted. *Id.* Because of that dismissal, the defendants argue that "*res judicata*, or claim preclusion, bars the relitigation of the claims that were brought, or should have been brought, in the state law action that was adjudicated on its merits and dismissed with prejudice." *Id.*, p. 42. The defendants point out that "'[r]*es judicata*, or claim preclusion, bars the relitigating of claims if the cause of action has been fully and finally determined on the merits between the same parties by a court of competent jurisdiction.'" *Id.* (quoting *Aaron v. Mahl*, 550 F.3d 659, 664 (7th Cir. 2008)).

Nadolski argues that the doctrine of *res judicata* does not apply for several reasons. First, he states that "[a]t the time the State Court's claim [sic] was filed against Casko, this Federal Court had already assumed subject-matter jurisdiction over the Porter County Sheriff's Department and Officer Hunnicut. Therefore, the State Court did not and could not acquire subject-matter jurisdiction as [28 U.S.C.] § 1331 grants the Federal Court 'original jurisdiction of all civil actions arising under the Constitution . . . .'" Plaintiff's Response, p. 40. In addition, Nadolski points out that the previous state court action "was filed against Dr. Shotick and

Medical Director Casko as a medical malpractice claim, not as a civil rights action under §

1983." *Id*. Nadolski also states that "the Porter County Sheriff's Department and Officer

Hunnicut were not parties to the State Court action." *Id*. Finally, Nadolski states that "Casko

was dismissed from the State Court medical malpractice action because she was working in the

course and scope of her employment for the Porter County Sheriff's Department pursuant to I.C.

34-13-3-5(b). No adjudication of the wrongful death claims or civil rights claims was

determined by the State Court." *Id*., p. 41.

In their reply brief, the defendants first point out that state courts do, in fact, have

jurisdiction to adjudicate claims brought under § 1983. Defendants' Reply, p. 22. They also

argue that the claims asserted in this lawsuit could have been brought in the state court action

and the fact that they were not does not bar the applicability of the doctrine of *res judicata*.

"'*Res judicata* bars not only those issues actually decided in the prior suit, but all other issues

which could have been brought.'" *Id*., p. 23 (quoting *Aaron v. Mahl*, 550 F.3d at 664).

According to the defendants, "Plaintiff had the right and ability to file its [sic] claims in this

matter in either the Porter Superior Court or the United State[s] District Court for the Northern

District of Indiana. Plaintiff, in essence, has attempted to get two bites of the apple. This is

exactly what *res judicata* is designed to prevent." *Id*. The defendants also argue that the prior

state court action "was NOT grounded in malpractice. Plaintiff does not allege in the [state

court] complaint . . . that Casko ever saw or treated Puza. . . . Thus, a claim for malpractice was

not properly plead and the claims were essentially allegations of negligence." *Id*. (capitalization

in original). Finally, the defendants claim that the "controversy adjudicated in the former action

was between parties to the present suit or their privies." *Id*. The defendants make this rather

curious argument by writing as follows:

> 'The term "privity" describes the relationship between persons who are parties to an action and those who are not parties to an action but whose interests in the action are such that they may nevertheless be bound by the judgment in that action.' *Dickson v. D'Angelo*, 749 N.E.2d 96, 99 (Ct.App.Ind. 2001) [sic]. 'The term includes those who control an action, although not a party to it, and those whose interests are represented by a party to the action.' Casko's actions were performed in the scope of her employment with the Porter County Sheriff's Department and thus, the former suit was adjudicated by the same parties and/or privies to the instant suit.

*Id.*, p. 24. These arguments are examples of the several specious arguments made in this case by both sides.[10] As for the plaintiff's alleged attempt to "get two bites of the apple," the court notes that the lawsuit now before this court *was* brought by Nadolski in the Porter Superior Court. It was *removed* to this court by the defendants. Docket at 2, Notice of Removal. So, while it is true that plaintiff filed two separate lawsuits arising out of essentially the same underlying facts (a situation that does not, in and of itself, automatically invoke the doctrine of *res judicata*), it is rather disingenuous for the defendants to accuse the plaintiff of some sort of nefarious attempt to litigate the same lawsuit in two separate courts. As for the defendants' argument that the prior state law action sounded in negligence rather than medical malpractice, that may be, but that distinction is insufficient to support the defendants' attempt to equate the claims in the prior state court action with those in the present one for purposes of applying *res judicata*. Most importantly, however, is the issue of the parties to the respective actions. While some of the factual issues presented in the state court action against Dr. Shotick and Ms. Casko may be the

---

[10] The plaintiff's argument in opposition to the defendants' motion for summary judgment on the state law claim under the Survival statute is also an example. The court does not mean to imply that counsel for the parties in this case are presenting frivolous arguments, only that certain arguments on both sides rest on very weak or contrived legal foundations.

same as some presented in the present case, the defendants are overreaching in their attempt to argue that the parties to that lawsuit were in privity to Hunnicut and the Sheriff's Department or that the interests of the defendants in this lawsuit were represented by Casko and Shotick in the state law case. For all of these reasons, the defendants' motion for summary judgment based on the doctrine of *res judicata* is DENIED.

## CONCLUSION

For the reasons set forth in this Opinion and Order, the plaintiff's motion to strike the defendants' reply brief is DENIED; the defendants' motion for leave to file their reply brief *instanter* is DENIED AS MOOT; the defendants' motion to strike the testimony of Dr. Nikkalyn Delaurentis is DENIED; and the defendants' motion for summary judgment is GRANTED in part and DENIED in part.


Entered: June 15, 2009.


  /s/  William C. Lee      
William C. Lee, Judge
United States District Court
Northern District of Indiana
